IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHAD V. HALLEY, | ) | CASE NO. 5:14CV343 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Chad V. Halley ("Halley") seeks judicial review of the final decision of
Defendant Commissioner of Social Security ("Commissioner") denying his application for
Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This
Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned
Magistrate Judge pursuant to the consent of the parties.  Doc. 15.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

Halley protectively filed applications for DIB and SSI on September 5, 2010, alleging a
disability onset date of June 22, 2010, that was later amended to July 5, 2010.  Tr. 108, 109, 293.
He alleged disability based on the following: Scheuremann's kyphosis disease, severe back and
hip pain, back injuries/multiple lumbar sprains, right hip pain, hypothyroidism, limited mobility,
morbid obesity and shortness of breath.[1]  Tr. 92, 100, 226.  After denials by the state agency

---

[1]  Scheuermann disease, kyphosis, is osteochondrosis of the vertebrae.  *See* Dorland's Illustrated Medical
Dictionary, 32nd Edition, 2012, at 1675.  Kyphosis is an area of the vertebral column that is convex.  *Id*. at 992.

initially (Tr. 108, 109) and on reconsideration (Tr. 110, 122), Halley requested an administrative

hearing.  Tr. 47.  A hearing was held before Administrative Law Judge ("ALJ") Yelanda Collins

on November 13, 2012.  Tr. 57-91.  In her November 30, 2012, decision (Tr. 19-34), the ALJ

determined that there were jobs that existed in significant numbers in the national economy that

Halley could perform, i.e., he was not disabled.  Tr. 32.  Halley requested review of the ALJ's

decision by the Appeals Council (Tr. 14) and, on December 24, 2012, the Appeals Council

denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 8-10.

## II. Evidence

### A. Personal and Vocational Evidence

Halley was born in 1984 and was 26 years old on the date his application was filed.  Tr.

31, 184.  He completed two years of college.  Tr. 227.  He last worked in 2010 and had jobs as a

retail cashier, management trainee, donation collector at Goodwill, gas station store clerk,

telemarketer, and grocery bagger.  Tr. 228, 246.

### B. Relevant Medical Evidence[2]

On April 24, 2004, Halley presented to the emergency department at the Akron General

Medical Center complaining of low back pain.  Tr. 328-333.  He reported injuring himself at

work while bending down and lifting a box.  Tr. 328-329.  Upon physical examination, Christ D.

Kyriakedes, D.O., found Halley to have a significantly kyphotic upper thoracic spine with some

tenderness with palpation in the lower left lumbar region.  Tr. 332.  He noted that Halley had full

strength and intact sensation in his upper and lower extremities.  Tr. 332.  Dr. Kyriakedes

diagnosed Halley with a lumbar spine strain.  Tr. 333.  Halley thereafter attended physical

therapy to treat his lumbar strain, in May and June 2004.  Tr. 314-325.

---

[2]  Halley asserts that he suffers physical and mental impairments that limit his ability to work.  Doc. 16, p. 2.
Because he only challenges the ALJ's decision with respect to his physical impairments, the discussion herein is
limited to the medical evidence pertaining to Halley's physical impairments.

On February 12, 2009, Halley presented to the emergency department at Barberton Hospital complaining of coughing, vomiting, congestion, and difficulty breathing.  Tr. 452.  He denied any pain and an examination of his back was unremarkable.  Tr. 452.  An x-ray taken of Halley's chest showed prominent thoracolumbar kyphosis.  Tr. 454.

On June 22, 2010, Halley presented to the emergency department at Barberton Hospital complaining of low back pain.  Tr. 311-312.  He reported "a sudden onset of left lower back pain" after bending over to pick something up at work.  Tr. 311.  He described the pain as radiating but denied any weakness or numbness.  Tr. 311.  Upon physical examination, Orion Colfer, M.D., noted that Halley was painful with palpation over the lumbar paraspinous musculature of his low back, but that he was comfortable and not in any acute distress.  Tr. 311.  Halley's cervical, thoracic, and lumbar spine were nontender to palpation and he had intact muscle strength, sensation, and deep tendon reflexes in both legs.  Tr. 311.  Halley was diagnosed with musculoskeletal back pain and treated with oral pain medication, anti-inflammatories, and a muscle relaxant.  Tr. 311-312.

On June 28, 2010, Halley saw his family physician, John M. Sassano, D.O., complaining of back pain.  Tr. 439-441.  Halley reported occasional middle and lower back pain, mild to moderate in severity, which was non-radiating.  Tr. 439.  His symptoms were aggravated by standing and were relieved by pain medications.  Tr. 439.  He weighed 400 pounds and his body mass index (BMI) was 64.55.  Tr. 440.  Upon evaluation, Dr. Sassano observed muscle spasm and moderate pain with motion in Halley's lumbar spine, tenderness in his right hip, and paraspinal tenderness upon palpation.  Tr. 440.  Dr. Sassano described Halley's gait as normal; Halley's paraspinous and lower extremity muscle tone was also normal.  Tr. 440.  Dr. Sassano

diagnosed Halley with an acute lumbar strain and prescribed a muscle relaxant and Percocet for pain.  Tr. 441.  Dr. Sassano drafted a letter excusing Halley from work for seven days.  Tr. 403.

An x-ray taken of Halley's thoracic and lumbar spinal segments on July 6, 2010, revealed no definite lumbar acute process, but showed lower thoracic spine wedge fractures.  Tr. 421.  On July 7, 2010, Dr. Sassano drafted a letter excusing Halley from work, writing, "[h]e may return to work pending [a]n evaluation from Orthopedic Specialist."  Tr. 394.

An MRI taken July 14, 2010, of Halley's thoracic spine revealed anterior wedge deformities of the T10 through L1 vertebral bodies corresponding to old processes.  Tr. 419. These deformities resulted in acute kyphosis at the thoracolumbar junction.  Tr. 419.  The MRI showed no disc bulges, herniation, nerve root encroachment, neuroforaminal narrowing, or stenosis.  Tr. 419.

Halley continued to see Dr. Sassano until October 2012.  Tr. 27, 365, 367, 426, 429, 489, 520, 526, 552, 557, 565, 568, 571, 578.   Halley's weight was recorded between 409 pounds (Tr. 359, 9/10/2010 visit) and 381 pounds (Tr. 579, 10/1/2012 visit). He complained of back pain, occasionally radiating towards his right hip.  *See, e.g*., Tr. 463, 568.  His symptoms were aggravated by changing positions, daily activities and standing.  *See, e.g*., Tr. 463, 568.  He consistently had no more than moderate pain and moderately reduced range of motion at his lumbar and thoracic spine. *See, e.g*., Tr. 463, 568.  He occasionally had muscle spasms.  *See, e.g*., Tr. 573, 566.  He had a normal gait and an ability to heel and toe walk.  *See, e.g*., Tr. 435, 576.  Dr. Sassano treated Halley's symptoms with Vicodin and a muscle relaxant.  Tr. 28, 428, 528, 580.  Halley continuously reported that the medication relieved his pain.  Tr. 28, 426, 492, 526, 557, 578.

On September 2, 2010, Halley saw Richard S. Brower, M.D., an orthopedic surgeon.  Tr. 357.  Dr. Brower described Halley as morbidly obese, with poor mobility and a "lumbering type gait."  Tr. 357.  He remarked upon an "obvious kyphotic deformity" in Halley's lower thoracic region, but noted that Halley has reasonable strength to dorsiflexion, his hips and knees moved well, and he had normal straight leg raising.  Tr. 357.  Dr. Brower reviewed Halley's x-rays and MRI and found "classic" kyphosis with wedge-shaped vertebrae but no evidence of cord impingement.  Tr. 357.  He recommended anterior and posterior fusion surgery in the affected region and gastric banding surgery for weight loss.  Tr. 357.

On January 16, 2012, Halley presented to the emergency department at Barberton Hospital complaining of low back pain after having run out of Vicodin.  Tr. 532.  He reported a muscle spasm in his thoracic spine.  Tr. 532.  Upon examination, Halley was tender to palpation in the kyphotic region of his thoracic spine.  Tr. 532.  He had no numbness or weakness in his lower extremities.  Tr. 533.  He was diagnosed with an acute flare-up of chronic mid-thoracic back pain and was given Vicodin and a muscle relaxant.  Tr. 532.

### C.  Medical Opinion Evidence

#### 1.  Treating Source

On January 26, 2011, Dr. Sassano completed a physical residual functional capacity ("RFC") questionnaire.  Tr. 446-447.  He opined that Halley could lift and/or carry five to ten pounds occasionally and frequently; could stand and/or walk a total of two hours in an eight-hour workday, for fifteen minutes without interruption; could sit a total of two hours in an eight-hour workday, for ten to fifteen minutes without interruption; could occasionally balance but never climb, stoop, crouch, kneel, and crawl; that his ability to reach, push and pull would be affected by his "chronic pain and weakness";  and that he should avoid heights, moving machinery,

temperature extremes, humidity, and vibration.  Tr. 446-447.  The form asked what medical findings support each assessment.  Tr. 446-447.  Dr. Sassano answered, "exam, x-ray" for the lift/carry/reach/push/pull assessment and "exam, history" for the rest.  Tr. 446-447.

On August 20, 2012, Dr. Sassano completed a second physical RFC questionnaire.  Tr. 555-556.   He opined that Halley could lift and/or carry less than five pounds occasionally and frequently; could stand and/or walk a total of two hours in an eight-hour workday, for ten minutes without interruption; could sit a total of two hours in an eight-hour workday, for ten minutes without interruption; could never balance, climb, stoop, crouch, kneel, and crawl due to his severe back pain and arm and leg weakness; that his ability to reach, push and pull would be affected by his "upper back and arm weakness";  and that he should avoid heights, moving machinery, temperature extremes, humidity and vibration.  Tr. 555-556.   The form asked what medical findings support each assessment.  Tr. 555-556.  Dr. Sassano answered, with respect to Halley's lift/carry and sit/stand/walk limitations, "back pain, weakness, upper/lower ext. weakness."  Tr. 555.  Dr. Sassano also opined that Halley would be off task for more than 25 percent of the time due to his symptoms and that he would likely be absent from work more than four days per month as a result of his impairments or treatment.  Tr. 556.

### 2. State Agency Reviewers

On December 10, 2010, James Gahman, M.D., a state agency physician, reviewed Halley's medical record.  Tr. 92-107.  Regarding Halley's residual functional capacity ("RFC"), Dr. Gahman opined that Halley could lift and/or carry twenty pounds occasionally and ten pounds frequently; could sit, stand and/or walk for a total of six hours in an eight-hour workday, with normal breaks; could push and/or pull an unlimited amount; could frequently climbs ramps and stairs but could never climb ladders, ropes and scaffolds; could occasionally stoop, kneel,

crawl and crouch; and was unlimited in his ability to balance.  Tr. 96.  Dr. Gahman explained

that these limitations were based on Halley's morbid obesity and kyphosis.  Tr. 96.  He also

opined that Halley had unlimited environmental limitations except that he should avoid all

exposure to hazards, and that he had manipulative limitations with respect to overhead reaching.

Tr. 96-97.

On March 19, 2011, Walter Holbrook, M.D., a state agency physician, also reviewed

Halley's record and completed a physical RFC assessment.  Tr. 116-121, 128-133.  Dr. Holbrook

affirmed Dr. Graham's opinion.  Tr. 116-121, 128-133.

### D.  Testimonial Evidence

#### 1.  Halley's Testimony

Halley was represented by counsel and testified at the administrative hearing.  Tr. 57-79.

He testified that he lives with his wife, his wife's aunt, and his wife's father in a house belonging

to the aunt.  Tr. 60-61.  He has a high school education and completed two years of college.  Tr.

62.  He stopped studying for financial reasons.  Tr. 62.  He is 5'6" tall and his weight fluctuates

between 380 pounds to about 400 pounds.  Tr. 60.

He testified that the last job he worked was as a store clerk.  Tr. 63.  He had that job for

four years but stopped working because he was missing too much work because of pain.  Tr. 63.

Halley previously worked at 84 Lumber as a management trainee.  Tr. 63.  He did

"everything"—grunt work, "running around," cashiered, stacked wood, took inventory, and

loaded and unloaded shipments.  Tr. 65.  At any given time, he lifted sixty pounds.  Tr. 65.  He

testified about working at Goodwill for about two years, unloading and loading donations.  Tr.

65.  He also worked as a telemarketer and as a cashier and grocery bagger at a grocery store.  Tr.

66.

Halley testified that he was prevented from working because he is unable to stand for more than ten minutes because of pain at the center of his back that radiates all though his back. Tr. 66-67.  The pain does not radiate into his arms or legs. Tr. 67.  He also is unable to sit because sitting causes the same kind of pressure in his back as standing.  Tr. 66-67.  Halley stated that the pain is sharp.  Tr. 67.  On a good day, his pain is five or six out of ten as long as he is lying down, and on a bad day his pain is ten out of ten.  Tr. 67.  He relieves the pain by taking pain medication and lying down.  Tr. 67-69.  The pain occurs every day.  Tr. 68.  Halley testified that, if he stands for fifteen minutes and the pain "start[s] to shoot up," then he would have to lie down for four hours; if he pushed himself "more than that" he may have to lie down for the rest of the day.  Tr. 68.

Halley stated that he can sit for ten minutes but that he then needs to lie down.  Tr. 69. Standing is harder than sitting and walking is "tough."  Tr. 69.  He can walk one block comfortably and two blocks total.  Tr. 69.  He has no problems using his hands.  Tr. 69-70.  He stated that he can currently lift ten or fifteen pounds but that he "couldn't do it very much."  Tr. 70.  He has problems with reaching and bending down because his body is "tight, [] my hamstrings, my joints and stuff, and it's extremely painful to bend, to try and reach."  Tr. 70.  His wife helps him put his shoes on.  Tr. 70.

Halley testified that he helps his wife with the laundry by switching the clothes from the washer to the dryer.  Tr. 71.  He goes grocery shopping with his wife about once a week.  Tr. 71, 75.  He uses the grocery cart like a walker and, after fifteen or twenty minutes, he returns to the car, sits down, and reclines the seat.  Tr. 71.  He walks up the stairs at his father's house twice a week.  Tr. 74.  He testified that his doctor suggested he walk to get exercise in order to lose

weight, which will help his back.  Tr. 74.  He has been unable to have gastric banding surgery because his insurance does not cover it.  Tr. 75.

Halley's wife helps him take a shower and get dressed because he is unable to reach and bend.  Tr. 71.  He attends church every Saturday, but he "lays on three seats" for about thirty or forty-five minutes of the service and then he has to leave.  Tr. 73.  Two or three times a week he experiences so much pain that his wife has to help him out of bed and to the bathroom.  Tr. 76-77.  He then returns to bed.  Tr. 76-77.  He testified that he is no longer taking Vicodin because the formula had changed to include more Tylenol and that his doctor had prescribed Norco instead.  Tr. 75-76.

### 2.  Vocational Expert's Testimony

Vocational Expert Thomas F. Nunberger ("VE") testified at the hearing.  Tr. 77-88.  The ALJ discussed with the VE Halley's past relevant work as a retail cashier, management trainee, material handler, store clerk, telemarketer, cashier/checker and grocery bagger.  Tr. 79-80.  The ALJ asked the VE to consider whether a hypothetical individual could perform the jobs Halley performed in the past if that person was limited to a range of light work and had the following characteristics: can  lift and carry no more than ten pounds frequently and twenty pounds occasionally; can sit up to two hours, stand and walk for six hours, and push and pull frequently with foot and hand controls, bilaterally; can frequently perform overhead reaching; can occasionally climb ramps and stairs but not ropes, ladders or scaffolds; can occasionally balance, stoop, kneel, crouch and crawl; must avoid exposure to unprotected heights, moving mechanical parts, concentrated exposure to humidity, wetness, extreme cold and heat; can occasionally operate a motor vehicle; and can occasionally be exposed to vibration.  Tr. 81.  The VE testified that the individual could perform Halley's past relevant work as a management trainee (300,000

national jobs, 600 local jobs), store clerk (2 million national jobs, 6,000 local jobs), and cashier/checker (1 million national jobs; 3,000 local jobs).  Tr. 82.

The ALJ asked the VE to consider whether the same hypothetical individual described above could perform those same three jobs if that individual could only occasionally push and pull with both the upper and lower extremities and occasionally perform overhead reaching, bilaterally.  Tr. 83.  The VE answered that the occasional overhead reaching would not be an issue but that the push and pull limitation would exclude the three jobs.  Tr. 83.  The ALJ asked the VE if the hypothetical individual described could perform other jobs, and the VE stated that such an individual could perform jobs as a packager (88,000 national jobs, 875 local jobs), electrical assembler (69,000 national jobs, 560 local jobs), and  cafeteria worker (92,000 national jobs, 810 local jobs).  Tr. 83-84.

Next, the ALJ asked the VE to consider whether a hypothetical individual could perform the jobs Halley performed in the past if that person was limited to less than a full range of sedentary work, can stand or walk up to two hours, sit up to six hours with some ability to alternate positions throughout the workday while being expected to remain on task, can frequently push and pull with both upper and lower extremities, frequently reach overhead bilaterally, and can perform the same postural limitations described in the first hypothetical.  Tr. 84-85.  The VE answered that such an individual could perform jobs as a polisher (59,000 national jobs, 410 local jobs), mailing house worker (48,000 national jobs, 390 local jobs), and call-out operator (61,000 national jobs, 460 local jobs).  Tr. 86-87.  The ALJ asked the VE if adding a restriction limiting the individual to occasional overhead reaching, bilateral, and an occasional push/pull limitation for the upper and lower extremities would change the VE's answer.  Tr. 87.  The VE replied that his answer would not change.  Tr. 87.

Finally, the ALJ asked the VE to consider whether a hypothetical individual could perform full time work if that person is unable to sit for more than two hours, stand or walk for more than two hours, and would be off task for more than twenty percent of the workday because of pain.  Tr. 87-88.   The VE answered that there would be no work for such an individual.  Tr. 88.  The ALJ asked the VE what the allowable percentage of time an individual could be off task during a workday and the number of days an individual could be absent  from work.  Tr. 88.  The VE stated that an individual off task ten percent of the time can still be working competitively; that an individual off task twenty percent of the time would not be competitive; and that he does not have an opinion with respect to the area between ten percent and twenty percent.  Tr. 87.  He also asserted that an individual absent more than two days would not be competitive.[3]  Tr. 87.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.   "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

---

[3]  Neither the ALJ nor the VE specified what the number of days absent referred to— days off per week or days off per month.  Tr. 87-88.  The Court hereafter assumes the ALJ and the VE were referring to days off per month.

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her November 30, 2012, decision, the ALJ made the following findings:

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1.     The claimant meets the insured status requirements of the Social Security
       Act through December 31, 2015.  Tr. 21.

2.     The claimant has not engaged in substantial gainful activity since July 5,
       2010, the amended alleged onset date.  Tr. 21.

3.     The claimant has the following severe impairments: Scheurmann's
       kyphosis at the thoracic spine with multiple wedge fractures and morbid
       obesity.  Tr. 22.

4.     The claimant does not have an impairment or combination of
       impairments that meets or medically equals the severity of one of the
       listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 23.

5.     The claimant has the residual functional capacity to perform sedentary
       work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he is
       further limited as follows:

           - While able to sit for up to 6 hours, should have some ability to
           alternate positions throughout the workday as needed but would
           remain present and on-task at the workstation;

           - Can only occasionally push or pull with the bilateral upper and
           lower extremities, as in the respective operation of hand and foot
           controls;

           - Can occasionally reach overhead bilaterally;

           - Can occasionally balance, stoop, kneel, crouch, or crawl;

           - Can occasionally climb ramps and stairs but never ropes,
           ladders, or scaffolds;

           - Should have no exposure to dangerous conditions, such as
           unprotected heights or moving mechanical parts, and can
           occasionally operate a motor vehicle;

           - Should only occasionally be exposed to vibration and should
           avoid concentrated exposure to humidity and wetness and to
           extreme heat and cold.  Tr. 24.

6.     The claimant is unable to perform any past relevant work.  Tr. 30.

7.     The claimant was born on May 30, 1984 and was 26 years old, which is
       defined as a younger individual age 18-49, on the amended alleged
       disability onset date.  Tr. 31.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 31.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 31.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 32.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from July 5, 2010, through the date of this decision.  Tr. 33.


## V. Parties' Arguments

Halley objects to the ALJ's decision on two grounds.  He argues that the ALJ failed to give valid reasons for the weight she assigned to the opinion of Halley's treating physician and that the ALJ improperly substituted her own judgment for that of a physician.  Doc. 16, p. 9.  He also asserts that the ALJ failed to meet her Step Five burden because she found that Halley could perform sedentary work despite the VE's response to the last question posed by the ALJ at the hearing.  Doc. 16, p. 13.  In response, the Commissioner submits that the ALJ properly weighed the treating source opinion and that substantial evidence supports the ALJ's Step Five finding.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A.  The ALJ properly considered the opinion of Dr. Sassano, a treating source

Generally, an ALJ must give the opinion of a treating source controlling weight if she finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Id.*  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Here, the ALJ properly considered Dr. Sassano's opinion.  With respect to Dr. Sassano's opinion, the ALJ stated,

> Although the undersigned has accepted the reaching, pushing/pulling, and environmental limitations in the claimant's [RFC], this treating physician's remaining opinions for no ability to perform any postural positionings and the restriction to just two total hours of sitting are belied by his own objective findings, unwavering prescribed treatment through medications, and reports of generally unremarkable pain complaints.  The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for one reason or another.  While it is difficult to confirm the presence of such motive, it is more likely present in situations where the treating

physician's opinion in question departs considerably from the objective medical findings and the weight of the evidence in general, as is true in the current case.  When comparing Dr. Sassano's longitudinal treatment notes dating back to June 2010 with the two fairly similar medical source statements he provided, they are simply not congruent in time or degree of the full degree of limitation he opines on these forms and is otherwise unsupported by his own records and the evidence as a whole.  And there is no accompanying rationale provided on these forms to overcome that substantial evidentiary disconnect beyond a perfunctory citation to the same largely unsupportive and disproportionate "exams, x-rays, history."  For these reasons, Dr. Sassano's opinions are found to be not controlling, not persuasive of any greater exertional or nonexertional restrictions beyond the range of sedentary work specified above, and further unconvincing for opined significant off-task and expected monthly absenteeism due to symptoms.  Ultimately, the undersigned gave only some weight to his statements to the extent consistent with the foregoing assessment of sedentary work.

Tr. 29.  Elsewhere in her decision, the ALJ described the longitudinal relationship Halley had with Dr. Sassano, including Halley's first visit wherein he exhibited a normal gait and only moderate pain with lumbar motion (Tr. 26, 439-441) and Halley's last visit wherein he exhibited a normal gait and no pain with motion (Tr. 27, 576).  The ALJ commented that Dr. Sassano's treatment notes throughout his relationship with Halley "consistently document no more than tenderness and moderately reduced range of motion at the thoracic and lumbar spine."  Tr. 27.  The ALJ observed that Dr. Sassano was Halley's family physician and treated Halley throughout with "a course of conservative nonsurgical treatment" (Tr. 27) and that "[t]his steady regimen of medications strongly conveys against any advancing or worsening symptoms, and the claimant continuously reported to his treating physician that they afford him relief of hi[s]" pain (Tr. 28).  The ALJ commented that, although Dr. Sassano opined that Halley is limited to sitting for only two hours a day for no more than ten minutes at a time, there was no evidence in the record that sitting was problematic beyond Halley's testifying so at the hearing.  Tr. 28.

The ALJ noted that, at other times when Halley was assessed by a medical professional, Halley was observed presenting with a normal gait.  Tr. 28, 534.  She noted that objective clinical findings showed wedge fractures but no acute lumbar issues, disc bulges or herniations,

nerve root encroachment, neuroforaminal narrowing, stenosis, or other consequences of the compression deformities and the resulting kyphosis.  Tr. 26.  She remarked that Dr. Brower, an orthopedic surgeon, described Halley's gait as "lumbering-type," but that Dr. Brower also noted that Halley's strength, sensation and mobility were intact with normal straight-leg raising.  Tr. 27.  The ALJ remarked that, since Halley's visit with Dr. Brower, Halley continued conservative treatment with his family physician, Dr. Sassano.   Tr. 27.  In short, the ALJ described the length, nature, and extent of Halley's treatment relationship with Dr. Sassano; noted that Dr. Sassano was not a specialist; and explained how Dr. Sassano's opinion was not supported or consistent with the record as a whole.  *See* 20 C.F.R. § 416.927(c)(2).

Halley maintains that the ALJ did not provide a rationale for assigning "some weight" to Dr. Sassano's opinion.  Doc. 16, p. 10.  He argues that the ALJ did not accept Dr. Sassano's opinions with respect to: (1) Halley's inability to perform any postural positionings; (2) Halley's limitation to sitting two hours a day; and (3) Halley's anticipated absences and time spent off task due to his impairments.  Doc. 16, p. 10-11.  Halley submits that the ALJ's reason—that Dr. Sassano's opinions were not supported by his treatment notes—is "not true," and, further, that the ALJ ignored evidence in the record contrary to her own opinion.  Doc. 16, p. 11.

Halley does not cite any evidence in the record showing that the ALJ's statements are "not true."  He does not identify evidence that he had, prior to the hearing, complained that sitting exacerbated his back pain.  Thus, the ALJ logically found that Dr. Sassano's opinion, that Halley is limited to sitting a total of only two hours a day for no more than ten minutes at a time, was not supported by Dr. Sassano's own treatment notes or the record as a whole.  Tr. 28 (citing treatment notes and observing that Halley had complained that standing, changing positions and undefined daily activities aggravated his pain but never complained that sitting aggravated his

pain).  The ALJ pointed out that Dr. Sassano limited Halley's postural activities but did not explain why he found Halley so limited, other than generically reciting, "exam, x-rays, history." Tr. 29.  Lastly, the ALJ found, for the same reasons described above, that Dr. Sassano's opinion that Halley would be off task more than twenty-five percent of the workday and absent more than four days a month, was not convincing.  Tr. 29.  Halley's assertion, that the ALJ's finding is belied by the fact that Halley "consistently complained of pain (albeit of a mild to moderate degree), he frequently has decreased range of motion on exam, and he frequently is noted to weigh nearly 400 pounds," is without merit.  Doc. 20, p. 3.  Halley does not cite legal authority supporting his assertion that mild to moderate pain, occasional decreased range of motion upon examination and a weight of 400 pounds necessitates a conclusion that an individual is off-task twenty-five percent of a workday and absent more than four days a month.

Halley submits that the ALJ impermissibly "play[ed] doctor" when she gave reduced weight to Dr. Sassano's opinion because she found the opinion was inconsistent with Dr. Sassano's own treatment notes.  Doc. 16, p. 10.  Halley appears to suggest that an ALJ may not consider whether a treating source's opinion is inconsistent with that source's own treatment notes.  The Court disagrees.  *See Golina v. Comm'r of Soc. Sec.*, 2012 WL 892608, *5 (March 14, 2012)* ("prohibiting the ALJ from evaluating records of a treating source to determine if such records support an opinion from that source 'would turn the treating physician rule on its head,'" quoting *Mason v. Comm'r of Soc. Sec.*, 2012 WL 669930, at *6 (N.D.Ohio Feb. 29, 2012)).

Halley argues that Dr. Brower, an orthopedic surgeon, suggested surgery but that Halley could not have the surgery because of his obesity.  Doc. 20, p. 3.  He argues that this fact bolsters Dr. Sassano's opinion with respect to Halley's limitations.  Doc. 20, p. 3.  Halley misconstrues the evidence.  Dr. Brower did not state that Halley could not have surgery because of his obesity.

Dr. Brower only stated that, because of Halley's weight, he, Dr. Brower, would not perform the surgery but would "send him . . . to someone who has a lot of experience with these fusions." Tr. 357.  The ALJ commented on the fact that, despite Dr. Brower's recommendation that he have surgery, Halley continued the same course of conservative treatment with Dr. Sassano, his family physician.  Tr. 27.  The ALJ observed that this consistent regimen of conservative treatment "strongly conveys against any advancing or worsening symptoms."  Tr. 28.

Finally, Halley argues that the ALJ "did not give enough consideration to the effects of Halley's morbid obesity on his functional capacities."  Doc. 16, p.12.  He states, "[w]ithout medical expertise, the ALJ is not in a position to find that thoracic spine compression fractures on a 400 pound individual are insufficient to support Dr. Sassano's medical opinions."  Doc. 20, p. 3.  The ALJ considered the effects of Halley's morbid obesity on his functional limitations. Tr. 27.  She accurately observed that the record contains no evidence that Halley's obesity contributed to his back problems, expressly noting the absence of medical expertise, from Dr. Sassano or any other treating source, that Halley's morbid obesity "has any disabling effect on [his] Scheuermann's kyphosis."  Tr. 27.  Halley does not identify evidence in the record indicating that the ALJ's assertion was inaccurate. In sum, in accordance with the treating physician rule, the ALJ properly evaluated the treating source opinion of Dr. Sassano and explained why she gave Dr. Sassano's opinion "some" weight.[5]

### B.  The ALJ did not err in her Step Five determination

---

[5]  Halley also states, "[i]t is also important to note that the opinions of the two State medical consultants were from only reviewing physicians who did not have the complete record" and points out what these opinions found.  Doc. 1, p. 13.  Halley does not articulate an argument that he would like the Court to consider and any such argument is deemed waived.  See *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." ).  Moreover, the Court notes that the ALJ assigned "little" weight to these opinions because the limitations in the opinions were not restrictive enough.  Tr. 30.

Halley argues that the ALJ erred in finding that he can perform sedentary work despite the VE's response to the ALJ's last hypothetical question.  Tr. 16, p. 13.  In her last hypothetical, the ALJ asked the VE to consider whether a hypothetical individual could perform full time work if that person is unable to sit for more than two hours, stand or walk for more than two hours, and would be off task for more than twenty percent of the workday because of pain.  Tr. 87-88.   The VE answered that there would be no work for such an individual.  Tr. 88.  The VE further stated that an individual off task twenty percent of the time or who would be absent more than two days a month would not be competitive.  Tr. 87.

An ALJ is only required to incorporate in her hypothetical those limitations that she finds credible.  *See Casey v. Sec'y of H.H.S.*, 987 F.2d 1230, 1235 (6th Cir. 1993).  Here, the ALJ presented numerous hypotheticals to the ALJ, including a hypothetical that included the limitations in ALJ's RFC finding.  Tr. 84-87.  The fact that the ALJ did not adopt an RFC that was as limited as her last hypothetical presented to the VE is not grounds for error.  *See Powers v. Comm'r of Soc. Sec.*, 2014 WL 861541, at * 5 (E.D. Mich. March 5, 2014) ("an ALJ typically asks hypothetical questions that are more limiting than the plaintiff's ultimate RFC because the ALJ needs a broad basis under which to make a determination. That is, if the ALJ does not ask such questions and ultimately determines that a plaintiff's RFC is more restrictive than the limitations posed in the hypothetical question, the ALJ would have no relevant testimony from the VE to assist in making a determination. Plaintiff's argument that the ALJ must adopt an RFC based on any one hypothetical question presented to the VE has no basis in law.").

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: January 26, 2015

Kathleen B. Burke
United States Magistrate Judge